## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Kevin and Freida Livingston, | ) | Case No. 21-10879 (LSS) |
| | ) | |
| | ) | Re: D.I. 22 |
| Debtors. | ) | |
| | ) | |

### OPINION

Before the court is a motion by the United States Trustee ("UST") to dismiss the chapter 7 bankruptcy case filed by Kevin and Freida Livingston ("Debtors"). The UST moves under Bankruptcy Code § 707(b)(1) and (b)(3)(B) arguing that the case should be dismissed because the presumption of abuse arises under the Means Test (defined below), or alternatively, based on the totality of the circumstances because Debtors can pay a good portion of their unsecured debt over time. Simply put, the UST argues the case must be dismissed if Debtors are unwilling to convert their case to one under chapter 13.

After an evidentiary hearing, I have determined that the presumption of abuse does not exist, that even if it did, special circumstances exist to rebut the presumption and the totality of the circumstances does not warrant dismissal. Finally, I would exercise my discretion not to dismiss in any event. Accordingly, for the reasons set forth below, the motion to dismiss is denied.

**Procedural Background**

On May 31, 2021, Debtors filed a voluntary petition under chapter 7 of the United States Bankruptcy Code.[1] Along with their petition, Debtors filed their Schedules,

---

[1] UST Exh. 1 (Voluntary Petition for Individuals Filing for Bankruptcy); D.I. 1.

Statement of Financial Affairs, and various other documents, including their Statement of Current Monthly Income (Official Form 122A-1) and Means Test Calculation (Official Form 122A-2).[2] Jeffrey Burtch was appointed the chapter 7 trustee and conducted a section 341 meeting of creditors over two days.[3] Thereafter, Mr. Burtch abandoned certain property and filed a Report of No Distribution.[4] After the section 341 meeting, Debtors filed their Amended Schedules D and E/F as well as an amended Official Form 122A-1 and amended Official Form 122A-2.[5]

On August 16, 2021, the UST filed his Motion to Dismiss.[6] Debtors filed their opposition to the Motion to Dismiss.[7] On September 29, 2021, I conducted an evidentiary hearing and heard argument. The matter is ripe for decision.

**Findings of Fact[8]**

*A. General Background*

Mr. Livingston is a United States Air Force reservist and has worked for the past 21 years at the Dover Air Force base as an aircraft maintenance technician for wartime preparation. He can be deployed anywhere at any time and can be called upon to fly into hostile areas to deliver troops and cargo. Mr. Livingston's civilian job requires that he

---

[2] *Id.*

[3] D.I. 14.

[4] D.I. 15, 16.

[5] D.I. 17; UST Exh. 2 (Amended Schedules); D.I. 17.

[6] United States Trustee's Motion to Dismiss the Debtors' Chapter 7 Case Pursuant to 11 U.S.C. §§ 707(b)(2) or (b)(3), D.I. 22.

[7] Debtors' Response to United States Trustee's Motion to Dismiss, D.I. 28.

[8] This Opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52 made applicable in contested matters by Federal Rules of Bankruptcy Procedure 7052 and 9014(c). These findings of fact draw on the trial testimony and the ten exhibits admitted at trial. The nine exhibits offered by the United States Trustee are referred to as "UST Exh.__" and the one exhibit offered by Debtors is referred to as "Debtor Exh. 1."

maintain both his status as an Air Force reservist and his high-level security clearance. Per United States Air Force policy, Mr. Livingston will be forced to retire as a reservist on April 13, 2023; he will therefore also be out of a job. At that time, his income will be cut in half. Mrs. Livingston has worked as an office assistance with Hearing Consultants of DE for the past three and a half years. Her work hours were recently reduced from 40 hours a week to approximately 21 hours.

The filing of this petition was prompted by Mr. Livingston's routine Air Force security review. During that review, the Livingstons' indebtedness was flagged as a security threat. Mr. Livingston's security manager suggested that the best way to resolve the issue was to file for bankruptcy protection. Mr. Livingston was given 60 days to resolve the situation.

### B. Income and Major Monthly Expenses

Debtors' combined monthly income, as adjusted downward by the UST for purposes of this Motion to Dismiss, is $9,142.12.[9] The Livingstons own three vehicles, a 2015 Chevy Colorado with 79,000 miles on it, a 2016 Chevy Cruze with 46,000 miles on it, and a four-wheel drive 2017 Jeep Wrangler with 52,000 miles on it.[10] The Chevy Colorado is Mr. Livingston's main car. To purchase this vehicle, Mr. Livingston borrowed from his federal Thrift Savings Plan ("TSP"), to which Mr. Livingston contributes on a pre-tax basis.[11] The loan was issued on February 20, 2019 in the amount of $34,667.24 ("TSP Loan"). As of December 31, 2020, the ending principal balance was $26,667.24.[12] A bi-monthly payment

---

[9] Denis J. Cooke, the Trustee's Bankruptcy Auditor reviewed Debtors' pay-stubs and determined that Debtors' current monthly income is only $9,142.12.

[10] UST Exh. 1.

[11] UST Exh. 7 (Thrift Savings Plan 2020 Annual Statement).

[12] The Schedules list the TSP Loan as a secured debt in the amount of $26,620.40 secured by collateral of $102,978.38. UST Exh. 2.

of $340.06 (or $680.12 monthly) is automatically deducted from Mr. Livingston's paycheck to repay the TSP Loan.[13] In order to obtain the TSP Loan, Mr. Livingston was required to sign documentation and agree to the automatic deduction from his paycheck.

The Jeep Wrangler was purchased in September 2020 and serves as Mrs. Livingston's main car. She chose a Jeep Wrangler because she wanted a dependable, four-wheel drive car to handle snowy winters. The monthly payment for the Jeep Wrangler is $896.12 per month.[14] This was the best monthly payment she could get for a Jeep Wrangler, which includes interest of 22.99%. Mrs. Livingston did not consider other vehicle options.

The Chevy Cruze is also financed and has a monthly payment of $325.05.[15] It is a "back-up" vehicle, which Mr. Livingston has not driven for about a year. The car is occasionally used by the Livingstons' 22-year old granddaughter, but it is not her main car.[16] It is also used by Mrs. Livingston to drive her elderly mother to the doctor as her mother has difficulty getting into the Jeep Wrangler and Chevy Colorado. The need to transport her mother to doctor appointments was not known at the time the Jeep Wrangler was purchased.

The Livingstons pay $103 monthly for internet access and $315.28 monthly for cell phone service, which includes $65 for the cost of the phone. Mr. Livingston is not supplied a phone by his employer. They do not have a landline. Mr. Livingston's job requires that he have special, secure high-speed internet and cell phone service. The documentation supporting these expenses are contained in the Livingtons' bank statements.[17]

---

[13] UST Exh. 7
[14] UST Exh. 2
[15] *Id.*
[16] The Livingstons' granddaughter currently lives with them. She had her own car until it was totaled in January 2021.
[17] Debtors' Exh. 1 (Dover FCU Bank Statements October 2020 through March 2021).

As of the Petition Date, neither Mrs. Livingston's wages nor Mr. Livingston's wages were being garnished. Mrs. Livingston's wages were garnished in October and November, 2020.[18] Mr. Livingston's wages also were garnished in October and November, 2020.[19]

---

[18] UST Exh. 6 (Earnings Statements from Hearing Consultants of DE for Mrs. Livingston) with pay dates and reflecting garnishments as follows:

| Pay Date | Garnishment | Year to Date Garnishment |
|---|---|---|
| 10/09/20 | $162.04 | $1,039.36 |
| 10/23/20 | $172.77 | $1,212.13 |
| 11/06/20 | $167.74 | $1,379.67 |
| 11/19/20 | $149.84 | $1,529.71 |
| 12/04/20 | $0.00 | $1,529.71 |
| 12/18/20 | $0.00 | $1,529.71 (regular pay) |
| 12/18/20 | $0.00 | $1,529.71 (Christmas Bonus) |
| 12/30/20 | $0.00 | $1,529.71 |
| 01/15/21 | No line for garnishment | |
| 01/29/21 | No line for garnishment | |
| 02/12/21 | No line for garnishment | |
| 02/28/21 | No line for garnishment | |
| 03/12/21 | No line for garnishment | |
| 03/26/21 | No line for garnishment | |
| 04/09/21 | No line for garnishment | |
| 07/02/21 | No line for garnishment | |

There was testimony that Mrs. Livingston's wages were being garnished as of the Petition Date and the underlying debt was paid off postpetition. This does not comport with Mrs. Livingston's pay stubs.

[19] UST Exh. 5 (Civilian Leave and Earnings Statement LES for Mr. Livingston) with pay dates and reflecting garnishments as follows:

| Pay Date | Garnishment | Year to Date Garnishment |
|---|---|---|
| 10/02/20* | No line for garnishment | |
| 10/16/20* | No line for garnishment | |
| 10/30/20* | $216.71 | $216.71 |
| 11/13/20* | $291.71 | $508.42 |
| 11/27/20 | $249.64 | $1049.77 |
| 12/11/20 | $0.00 | $1049.77 |
| 12/24/20 | $0.00 | $1,049.77 |
| 01/08/21 | No line for garnishment | |
| 01/22/21 | No line for garnishment | |
| 02/05/21 | No line for garnishment | |
| 02/19/21 | No line for garnishment | |
| 03/05/21 | No line for garnishment | |
| 03/19/21 | No line for garnishment | |
| 04/02/21 | No line for garnishment | |
| 04/16/21 | No line for garnishment | |
| 07/09/21 | No line for garnishment | |

### C.  Total Unsecured Nonpriority Debt

On their Amended Schedule F, Debtors scheduled non-priority unsecured debt of

$72,253.80.  The entries at 4.1 (ACI in the amount of $9,577.02) and 4.2 (Ally Financial in

the amount of $9,577.02) are duplicative and relate to the repossession of a Kia.  The entries

at 4.21 (Radius Global Solutions LLC in the amount tof $17,315.76) and 4.22 (Regional

Acceptance Company in the amount of $17,315) are duplicative and relate to the

repossession of a Silverado.  The entries at 4.7 (Doroshow, Pasquale, Krawitz & Bhaya in

the amount of $400) and 4.5 (Cash Central in the amount of $1,673.03) were paid off

postpetition.[20]

### *The Parties' Positions*

The UST contends that Debtors have improperly performed the Means Test

calculation.  The UST presented the Declaration[21] and testimony of Denis J. Cooke, a

Bankruptcy Auditor for the Office of the United States Trustee, Region 3, District of

Delaware in which Mr. Cooke explains adjustments he believes need to be made to Debtors'

Official Form 122A-2 in order to arrive at the proper figures.  At the hearing, he walked

through these adjustments and a spreadsheet depicting a comparison of Debtors'

calculations, his adjustments and his re-calculation of the Means Test.[22]  Based on Mr.

---

The earnings statements in 2020 with an * contain a line item labeled "Allotment, SV" with no
current deduction and a year to date deduction of $1456.00.  There is no indication what this
allotment was for.

[20] UST Exh. 2.  The UST did not challenge the amount of unsecured debt in the Motion to Dismiss.
This information comes from the cross-examination at trial.

[21] UST Exh. 3 (Declaration of Denis J. Cooke, Bankruptcy Auditor, in Support of the Motion of the
United States Trustee to Dismiss the Debtor's [sic] Chapter 7 Case Under 11 U.S.C. §§ 707(b)(2) or
707(b)(3)).

[22] UST Ex. 4.  Mr. Cooke's testimony was very helpful in aiding my understanding of the UST's
position.  Much of it, however, was not factual.  Some was clearly legal in nature; other testimony
was based on Mr. Cooke's own experience with his TSP loan.

Cooke's analysis and calculations, the UST argues that a presumption of abuse arises in this case under § 707(b)(2)(A). Alternatively, the UST contends that an abuse arises under the totality of the circumstances test of § 707(b)(3)(B) by focusing largely on Debtors' ability to repay their debt. The UST does not contend that the petition was filed in bad faith for purposes of § 707(b)(3)(A).

Debtors take issue with many of the adjustments Mr. Cooke makes to their Means Test calculation. In particular, they contend that the garnishments, vehicle deductions and one of the TSP Loan deductions is permissible. They further contend that their chapter 7 filing is permissible because of special circumstances.[23] Finally, Debtors argue that the totality of the circumstances weighs in their favor.

## JURISDICTION

Original and exclusive jurisidiction exists over this bankruptcy case and therefore the Motion to Dismiss by virtue of 28 U.S.C. § 1334(a).

## DISCUSSION

I.    The UST has not met his Burden to Show that the Presumption of Abuse Arises

Section 707(b)(1) provides that the court *may* dismiss a chapter 7 case filed by an individual debtor whose debts are primarily consumer debts if the court finds "that the granting of relief would be an abuse of the provisions of this chapter." Section 707(b)(2) provides for circumstances under which a presumption of abuse exists: "[t]he court shall presume abuse exists if the debtor's current monthly income reduced by [permitted

---

[23] While Debtors did not reflect special circumstances on Official Form 122-A2 (presumably because they did not need to as their calculations show no presumption of abuse), Debtors did raise special circumstances in Debtors' Response and at trial.

deductions] and multiplied by 60 is not less than the lesser of (I) 25 percent of the debtor's

nonpriority unsecured claims in the case, or $8,175, whichever is greater; or (II) $13,650." [24]

The permitted deductions related to monthly expenses are enumerated in detailed, precise

terms in subsection (2)(A)(ii). [25]  Subsection (2)(A)(iii) dictates how secured debt is handled

in the abuse determination. [26]  This calculation, embodied in Official Form 122A-2 is

colloquially called the means test ("Means Test") and it has been characterized as

mechanical or formulaic.

The Means Test is intended to be a static snapshot of a debtor's finances at the time

of filing[27] albeit with certain aspects of that snapshot encompassing the six-month

prepetition period. [28]  The Means Test is not intended to be a true measure of a debtor's

---

[24]  11 U.S.C. § 707(b)(2)(A)(i).

[25]  11 U.S.C. § 707(b)(2)(A)(ii)(I)("The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent.  Such expenses shall include reasonably necessary health insurance, disability insurance, and health savings account expenses for the debtor, the spouse of the debtor, or the dependents of the debtor.  Notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts.  In addition, the debtor's monthly expenses shall include the debtor's reasonably necessary expenses incurred to maintain the safety of the debtor and the family of the debtor from family violence as identified under section 302 of the Family Violence Prevention and Services Act [42 USCS § 10402], or other applicable Federal law.").

[26]  11 U.S.C. § 707(b)(2)(A)(iii) (The debtor's average monthly payments on account of secured debts shall be calculated as the sum of—
(I) the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the filing of the petition; and
(II) any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title [11 USCS §§ 1301 et seq.], to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;
divided by 60.").

[27]  *In re Smale* 390 B.R. 111, 119 (Bankr. D. Del. 2008) (court concluding that to allow a movant to include the outcome of future events as part of the means test would eliminate the distinction between the presumption of abuse test in § 707(b)(2) and the totality of the circumstances test in § 707(b)(3)).

[28]  11 U.S.C. § 101(10A), n.37 *infra*.

financial position.  As detailed in the statute, some monthly expenses are based on or

capped by the National Standards and Local Standards while others are based on a debtor's

actual monthly expenses.[29]  The Supreme Court recognizes the Means Test as a

"standardized formula" that "eliminates case-by-case determinations" in favor of a bright

line metric.[30]

If a presumption of abuse arises under § 707(b)(2), it may be rebutted by

demonstrating special circumstances, such as a serious medical condition or order to active

duty service in the Armed Forces.  Debtors must support an assertion of special

circumstances by documentation and a detailed explanation of the special circumstances

that make such expenses or adjustment to income necessary.  Debtors must also

demonstrate that such expense or adjustment, itself, is reasonable as well as the lack of a

reasonable alternative.[31]

Even if an abuse of presumption exists and it is not rebutted by special

circumstances, a court is not required to dismiss the chapter 7 case.  Section 707(b)(2) is

discretionary ("the court *may* dismiss a case") not mandatory.[32]

---

[29] 11 U.S.C. § 707(b)(2)(A)(ii)(I) ("The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides as in effect on the date of the order for relief . . . .").  Subsections (ii)(II)–(V) also list other expenses that may be deductible, but are not implicated in this dispute.

[30] *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 78 (2011).

[31] 11 U.S.C § 707(b)(2)(B)(i), (ii).

[32] *See* fulsome discussion in *In re Mravik*, 399 B.R. 202 (Bankr. E.D. Wis. 2008) (concluding that dismissal under § 707(b) is permissive, not mandatory, but that the discretion to deny a motion to dismiss notwithstanding presumed abuse "should not be exercised lightly."); *but see In re Haman*, 366 B.R. 307, 311 (Bankr. D. Del. 2007) (if the presumption of abuse arises and is not rebutted by special circumstances, court has no discretion and must dismiss case; arguably dicta as there is no discussion of the use of the word "may" in the statute and the court finds special circumstances in any event).

### A. Burden of Proof

In the Motion to Dismiss, the UST asserts that Debtors have the burden of proof to demonstrate special circumstances sufficient to rebut a presumption of abuse.[33] The UST further argues that the standard to rebut the presumption is "extremely high, placing it effectively off limits for most debtors."[34] Debtors do not dispute that they have the burden of proof to demonstrate special circumstances (which they argue they have met), but disagree with the characterization of the standard. I agree that Debtors have the burden to show special circumstances to rebut a presumption of abuse once it is established. I need not characterize this burden; it is spelled out in the statute itself.

In contrast, the UST did not cite to any case law setting forth the burden of proof (or characterizing it) with respect to the Means Test, itself. Implicit in the absence of a stated standard is the acknowledgement that the movant, here the UST, has the burden of proof on his Motion to Dismiss.[35] In the absence of any argument to the contrary, I conclude that the UST has the burden of proof/persuasion to show that the presumption of abuse exists.[36]

---

[33] Motion to Dismiss ¶ 19 citing *In re Harmon*, 446 B.R. 721, 727 (Bankr. M.D. Pa. 2008).

[34] *Id.* citing *In re Martin*, 505 B.R. 517, 521 (Bankr. S.D. Iowa 2014).

[35] The implicit recognition of the burden of proof is also evidence by the fact that the UST submitted the Cooke Declaration contemporaneously with the Motion to Dismiss and presented Mr. Cooke as a witness at the hearing.

[36] *See e.g. In re Beard*, 605 B.R. 868, 873 (Bankr. E.D. Ark. 2019) ("party bringing the action for dismissal carries the burden of proof."). My independent research shows that some courts have concluded that the movant has the burden of proof on a motion to dismiss with one qualification— that the debtor has the burden of proof with respect to "other necessary expenses." *See e.g. In re Ervin*, Case No. 15-70467, 2016 WL 721043 * 9 (Bankr. W.D. Va. Feb. 23, 2016). The rationale is that with respect to Other Necessary Expenses (i) the information is more readily available to the debtor and this category deals with factual issues unique to the debtor and (ii) debtors have an incentive to make these expenses as large as possible. *In re Meade*, 420 B.R. 291, 303 (Bankr. W.D. Va. 2009). The *Meade* court also compares "other necessary expenses" to "special circumstances" and as in the nature of an affirmative defense. *Id.* The qualification taken by the *Ervin* and *Meade* Courts, while perhaps practical, does not find its basis in the Code. Rather, it blurs the clear line of demarcation between subsections A and B of the Means Test. Subsection A permits a debtor to deduct three types of expenses: applicable monthly expenses specified in the National Standards, applicable monthly expenses specified in the Local Standards, and actual monthly expenses for the

### B. *Debtors' Total Current Monthly Income/Lines 2 and 11*

The first part of the Means Test is a determination of Debtors' current monthly income. Debtors listed this amount at $10,415.00. Mr. Cooke reviewed Debtors' pay-stubs and determined that Debtors' current monthly income is only $9,142.12. I will accept Mr. Cooke's number, which Debtors do not contest.[37] This equates to an Annualized Current Monthly Income of $109,705.44, which is above the Applicable Median Family Income of $78,813.00.

### C. *Debtors' Total Nonpriority Unsecured Debt*

The UST has met its burden to show that Debtors' total nonpriority debt is not $72,253.80 as reflected on Debtors' Amended Schedule F. It is undisputed that there are duplicative entries for debt related to the Kia and the Silverado. So, $26,892.78 must be subtracted from Debtors' scheduled amount. But, I will not deduct the debt that was paid off postpetition. As discussed *infra*, the Means Test is a snapshot in time as of the filing of the petition. It would be inappropriate, therefore, to exclude debt voluntarily paid postpetition. Making the necessary adjustment for the duplicative entires results in total

---

categories specified as Other Necessary Expenses, each as issued by the Internal Revenue Service. Subsection B permits a debtor to rebut the result reached by the application of the standards set forth in subsection A. Further, as shown by this case, the UST may challenge deductions in all categories. I cannot conclude in this matter that in each instance information is more readily available to Debtors than to the movant.

[37] Mr. Cooke testified that the relevant period for review of income and pay stubs is November 2020 through April 2021 (the six months prior to the filing of the voluntary petition). *See also* 11 U.S.C. § 101(10A), which provides, in relevant part, that the term "current monthly income"

   (A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on–

      (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

      (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii) . . . .

nonpriority debt of $45,361.02 for purposes of the Means Test. Twenty-five percent of that number is $11,340.26.

### D. Permitted Expense Deductions—National and Local Standards

Section 707(b)(2)(A)(ii)(I) enumerates the monthly expenses that may be deducted from a debtor's current monthly income:

> The debtor's monthly expenses shall be the debtor's applicable monthly expense amount specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date the order for relief, for the debtor, the dependents of the debtor, and the spouse of the debtor in a joint case, if the spouse is not otherwise a dependent. Such expenses shall include reasonably necessary health insurance, disability insurance, and health savings account expenses for the debtor, the spouse of the debtor, or the dependents of the debtor. Notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts. * * * In addition, if it is demonstrated that it is reasonable and necessary, the debtor's monthly expenses may also include an additional allowance for food and clothing of up to 5 percent of the food and clothing categories as specified by the National Standards issued by the Internal Revenue Service.

Section 5.15.1 of the Internal Revenue Code's Financial Analysis Handbook ("Handbook")[38] contains the referenced National Standards (5.15.1.9), Local Standards (5.15.1.10) and "Other Expenses" (5.15.1.11).[39] I will address the contested expenses in turn.

---

[38] The Handbook can be accessed at http://www.I.R.S.gov/irm/part5/ch15s01.html # d0e175877.

[39] The Handbook lists fifteen categories of expenses which may be considered necessary under certain circumstances. IRM § 5.15.1.11. It does not use the defined term "Other Necessary Expenses." But, the Handbook explains: "Other expenses may be necessary or conditional. Other necessary expenses meet the necessary expense test and normally are allowed. The amount allowed must be reasonable considering the taxpayer's individual facts and circumstances. Other Conditional Expenses may not meet the necessary expense test, but may be allowable based on the circumstances of an individual case." *Id.* While I cite the Handbook when useful, only the tables are incorporated in § 707. The instructions in the Handbook are helpful guidance to the extent they are not contrary to the Code. *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 73 (2011) (Section 707 does not incorporate or import the explanatory guidance set forth in the IRS Collection Financial Standards and such guidelines cannot control where they are at odds with the Code.). Nevertheless, the guidelines may be consulted, as appropriate.

*(i)*     <u>*Taxes/ Line 16*</u>

Debtors listed their taxes at $1,712. Based on his review of Debtors' pay stubs, Mr. Cooke adjusted Debtors' taxes upwards to $1,899.80. I will accept Mr. Cooke's number, which Debtors do not contest.

*(ii)*     <u>*Involuntary payroll deductions/ Lines 17 (Wage Garnishment and TSP Loan)*</u>

On Official Form 122A-2, Debtors deducted $1,624.81 on Line 17, involuntary payroll deductions. According to Mr. Cooke, the $1,624,81 figure consists of health care expenses, retirement contributions, retirement savings, union dues, wage garnishments and the repayment of the TSP Loan.[40] The UST argues that the wage garnishments and TSP Loan are not properly included in this category.

*(a) The Wage Garnishments are Deductible*

The sole basis on which the UST argues that the Means Test does not permit a deduction for the garnishment of Mr. or Mrs. Livingston's wages is that the garnishments had ceased by the Petition Date. This is true. But, the evidence shows that Mrs. Livingston's wages were garnished for a portion of the appliable prepetition period Averaging the monthly garnishment of Mrs. Livingston's paycheck over that period results in a deduction of $52.92 per month. Mr. Livingston's wages were also garnished during the relevant six month-period. Averaging his monthly garnishment over that period results in a

---

[40] Debtors denied that their Involuntary Deductions were overstated and maintain that both the repayment of the TSP Loan and the wage garnishments should be included in Line 17. Debtors did not dispute Mr. Cooke's statement that the TSP Loan repayment is $680.12 per month and the wage garnishment included in Line 17 is $540.89 per month. *See* Debtors' Response to United States Trustee's Motion to Dismiss, D.I. 28.

deduction of $90.22 per month. Combined, then, $143.15 should be included as a deductible expense on Line 17.[41]

(b)    *The TSP Loan is Not Properly Deducted on Line 17*[42]

Debtors included their repayment of the TSP Loan in Line 17. On the surface, the inclusion seems appropriate as the TSP Loan fits the plain English definition of an involuntary deduction from Mr. Livingston's paycheck. As Mr. Livingston testified, when he took out the TSP Loan, he had no options in terms of repayment. A deduction from his paycheck was mandated.

Notwithstanding the mandatory nature of the deduction, repayment of a TSP Loan is not properly included in this category. Both the Official Form 122 A-2 and the Handbook provide that an Involuntary Deduction is "necessary" "if it is a requirement of the job, e.g. union dues, uniforms, work shoes." Repayment of the TSP Loan does not fit neatly into this category. While repayment of the TSP Loan may be mandatory, taking out the loan in the first instance cannot be appropriately labeled a requirement of the job.

After considering the parties' positions, the deduction for the TSP Loan is not permitted. The proper expenses deducted in the Involuntary payroll category total $595.56.[43]

---

[41] Mr. Cooke testified that if garnishments were included on Line 17 the amount would be $80 per month. He did not testify on how he arrived at the number. My calculations are based on the total garnishments for the period of November 2020 to April 2021 as reflected in Debtors' respective pay stubs spread over that six month period.

[42] I will address the deductibility of the TSP Loan as a secured debt later in this opinion.

[43] Further, because I conclude that the TSP Loan is a debt (*see infra*), it is not properly deducted here because it is not an expense.

*(iii)    Vehicle 2- Net Ownership or Lease Expense/Line 13(f)*

On Official Form 122A-2, Debtors deduct vehicle ownership expenses for the Jeep Wranger and the Chevy Cruze.  The UST objects to the deduction for the expense related to the Chevy Cruze on the basis that it is an "expense of a third car."

Debtors are not attempting to deduct the ownership expense of three cars, rather they have chosen two of their three vehicles to include for the ownership expense.  The form instructs debtors to use the Local Standard for the ownership cost for their area, and then deduct the monthly payments on debt secured by their vehicle to arrive at a net vehicle [ownership] expense.[44]  Debtors' mathematical calculations for the listed vehicles are correct.

The UST cites no cases for the proposition that a debtor with more than two cars must choose to use their "main" cars in calculating the vehicle ownership expense deduction.  Indeed, the instructions offer no advice on how to select among vehicles that a debtor owns.  The only restriction is that the expense cannot be taken on more than two vehicles.  With no authority cited, and an ability to deduct this expense for up to (but no more than) two vehicles, I conclude that the UST has not met its burden of proof to show that Debtors' deduction for the Chevy Cruze is inappropriate.[45]  The deduction of $207.96 is permitted.

---

[44]  11 U.S.C. § 707(b)(2)(A)(ii)(I) instructs Debtors to deduct their "applicable monthly [automobile] expense amounts specified under the National Standards and Local Standards . . . [however] notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts."  The tables in the Standards allow for, and calculate, the regional standard costs for one car for each filing taxpayer.

[45]  *See In re Stallings*, 2009 Bankr. LEXIS 1187 * 6 (Bankr. E.D.N.C. May 4, 2009) (Debtors allocated their four cars between vehicle ownership expense and secured debt so as to maximize the deductions from their current monthly income.  Court held that debtors "were not required to list their expenses in a way that maximizes their disposable income.").

    *(iv)    Optional telephone services / Line 23*

Telephone service above and beyond basic telephone and internet service are specifically recognized as deductible for purposes of the Means Test.[46]  Debtors deducted $400 for such services.  The UST argues that this deduction is not proper because Debtors did not provide support for these expenses, which the UST contends are basic and routine. He bases this argument in part on the inclusion of the $400 expense on Line 6c of Schedule J.

Mr. Livingston's status as a reservist and job as an Air Force technician requires him to be reachable at any time and in any place.  While the testimony could have been more detailed, his position requires a special high-level secure phone and internet line. Accordingly, this $400 monthly expense, supported by both the testimony of Mrs. Livingston and the Livingstons' monthly bank statements, is a permissible deduction.  The UST has not met his burden of proof to show what portion of the monthly bill is for basic telephone and internet.  Further, the UST has not cited to any authority that concludes that Line 6 on Schedule J includes only basic utilities, or that it did here.  Accordingly, the deduction on Line 23 of $400 is properly taken.[47]

---

[46] *See* Form 122A-2 Line 23.

[47] While the UST may have asked Debtors for further support for this expense, there is no record that the UST sent a formal document request which went unanswered.  Given that it is apparent that the charges exceed basic telephone and internet, it was incumbent on the UST to provide information as to what portion of the $400 was for basic services and internet. *See e.g. Beard*, 605 B.R. at n.10 (failure of UST to issue discovery or seek court's assistance in obtaining documents, among other things, did not excuse UST analyst from calculating debtor's current monthly income based on six months of financial information, rather than the five months of financial information debtor provided.).

### E. Permitted Additional Expense Deductions

Debtors listed deductions of $1,025.70 in health insurance expense and $44.00 for additional clothing expense. The UST challenges $446.87 of the health insurance expense and all of the clothing expense alleging no documentation was provided to substantiate these items.

The UST has sustained his burden here. Mr. Cooke testified that based on Mr. Livingston's pay stubs, the Livingstons' health insurance expense is $578.83 and he accounted for both dental and vision insurance in another expense line item. On cross-examination, neither Debtor was able to explain the additional $446.87 in health insurance expense nor can any additional amounts be discerned from the Livingstons' paystubs. Similarly, while Mrs. Livingston did testify that certain entries reflected in Debtors' bank statements may constitute clothing expenses, she did not provide sufficient testimony or documentation regarding excess clothing expenses.

The correct amount of Additional Expense deductions is $578.83.

### F. Permitted Deductions for Debt Payments

As part of the Means Test, Debtors can deduct monthly payments on account of secured debts.[48] On Official Form 122A-2, Debtors deducted the monthly payments on the Jeep Wranger [$896.12], the Chevy Cruze [$325.04] and the TSP Loan [$681.12]. The UST objects to $363.12 of the deduction taken on the Jeep Wrangler asserting that this is above the IRS standard of $533. The UST objects to the deduction for the Chevy Cruze in total, arguing that it is a third car and is "considered an excessive expense for the benefit of a nondependent granddaughter." Finally, the UST objects to the deduction of the monthly

---

[48] 11 U.S.C. § 707(b)(2)(A)(i), (iii).

payments on the TSP Loan arguing that it is both double counted (because of the deduction in Line 17) and the TSP Loan is not a debt. The UST further argues that if the TSP Loan is not repaid, "the Debtor would only be liable for payment of the income tax on any capital gain."

(i)     *The Jeep Wrangler*

Section 707(b)(2)(A)(iii) permits a debtor to deduct the "scheduled contractual amount" of his secured debt. The UST seeks to cap the debt for the Jeep Wrangler at $533, the amount of the IRS Local Standard used in the Vehicle Ownership expense calculation in Line 13. The UST's position is contrary to the express language of the statute. The statute provides for deduction of payments on all secured debt at the contractual amount. There is no reference to any cap—statutory or otherwise. And, there is no reference to the IRS Local Standard. Further, the UST has not cited any authority for this position. The UST has not met its burden of proof on this expense, accordingly, Debtors are entitled to deduct the full payment for the Jeep Wrangler.

(ii)     *The Chevy Cruze*

In his recalculation, the UST eliminates the deduction for the Chevy Cruze, again arguing that it is a "third car" used by Debtors' granddaughter and is an "excessive expense." First, the evidence is to the contrary. The Chevy Cruze was not bought for the granddaughter who now only uses it occasionally because her own car was totaled. Second, and more importantly, the statute does not limit the number of cars that can be deducted as secured debt. Even Official Form 122-A contemplates that a debtor may have more than

two vehicles and deduct each one of them.[49]  So, even if this is a "third car," the deduction

here is appropriate.  Once, again, the UST has cited no authority for this position.  The UST

has not met its burden of proof on this expense, accordingly, Debtors are entitled to deduct

the payment for the Chevy Cruze.

    *(iii)*    *The TSP Loan*

       The UST asserts in the Motion to Dismiss that the TSP Loan is not deductible as a

secured debt.  The UST avers that a TSP loan is both voluntary and not secured, but rather

a repayment of a debtor's own funds.  The UST also avers that nonpayment of the TSP

Loan will "only" result in Debtors becoming liable for payment of the income tax on any

taxable gain.[50]  Recognizing that he had not cited any legal authority for these propositions

in the Motion to Dismiss, during argument, the UST directed me to *In re Montalto*.[51]

       In *Montalto*, the court joins the majority in ruling that a 401(k) loan repayment is not

repayment of a debt within the meaning of the Code.[52]  The first case in the long string cite

for this position is the Ninth Circuit's *Egebjerg* opinion.[53]  *Egebjerg* is directly on point as the

---

[49] *See* Lines 33b and 33c with spaces for "Loans on your first two vehicles" and Line 33d with more spaces for other secured debts.  *See also* 6 *COLLIER ON BANKRUPTCY* ¶ 707.04[3][c] (16th ed. 2019).

[50] Motion to Dismiss 4.  The averment that Debtors' nonpayment of the TSP Loan will result in payment only on capital gains appears to be incorrect because Mr. Livingston's contributions to the TSP were made on a pre-tax basis.  If repayments are not made, the TSP Loan will be treated as a taxable distribution, with a possible 10% penalty for an early distribution. https://www.tsp.gov/publications/tspbk04.pdf.  Because the UST's statement in the Motion to Dismiss was based on Mr. Cooke's testimony, it may be that Mr. Cooke's own contributions to the TSP are made on a post-tax basis (i.e. like a Roth IRA).

[51] *In re Montalto*, 537 B.R. 147 (Bankr. E.D.N.Y. 2015).

[52] *Id*. at 159 (collecting cases).  The court further holds that a 401(k) loan repayment is not a proper expense deduction (e.g. as an involuntary deduction) because while Congress chose to exclude 401(k) loan repayments from chapter 13 disposable income, it declined to allow this type of expense as a deduction in a chapter 7 case.  The court notes, as discussed *supra*, that the Means Test is a specific formula and courts may not choose to vary that formula.  The court did, however, leave open the possibility that a 401(k) loan repayment may qualify as a "special circumstance."

[53] *In re Egebjerg*, 574 F.3d 1045, 1049 (9th Cir. 2009).

issue determined was whether a debtor's repayment of a 401(k) loan constitutes a monthly payment on account of secured debt or an other necessary expense for purposes of the Means Test. The Ninth Circuit starts with the definitions of "debt" and "claim" finding them to be co-extensive and concluding that a retirement plan loan constitutes a "debt" only if the plan administrator has a "'claim' for repayment." The court reasons that the debtor's loan obligation is "a debt to himself" and that the plan administrator would have no personal recourse against the debtor for failure to make loan payments. The court concludes, therefore, that while a deemed distribution caused by the failure to repay a 401(k) loan will have tax consequences to the debtor, it does not create a debtor-creditor relationship.[54]

This lack of personal recourse against the debtor is also the basis of the Second Circuit's *Villarie* decision,[55] which appears to be the foundational decision for subsequent court rulings that a loan from a retirement plan is not a "debt." In *Vallarie*, the New York Employees' Retirement System—i.e., the plan—brought an adversary proceeding seeking a declaration: (i) that the debtor's loan from the plan could not be discharged in a chapter 7 case and and (ii) that the plan could resume withholding loan repayments from the debtor's

---

[54] The Ninth Circuit also supports its decision by two statutory cannons. First, it recognizes the pre-BAPCPA cases holding that retirement loans are not "debt" and that Congress did not expressly change this in BAPCPA. Second, the Court notes the extensive changes in BAPCPA made to chapter 13 with respect to retirement loan contributions and loan repayments. *Id.* at 574. However, in certain sections of the Code amended by BAPCPA, Congress appears to have consciously determined not to address the pre-BAPCPA caselaw by taking a "functional approach" to the retirement debt issue. 4 *COLLIER ON BANKRUPTCY* ¶ 523.26 (16th 2021)(recognizing the debate about whether loans from retirement plans constitute debt and stating "[i]n enacting section 523(a)(18), Congress has not unequivocally settled the conceptual issue but, instead, has taken a functional approach. Regardless of whether a debtor's obligation to repay a loan from the covered retirement plans or accounts is a debt within the meaning of the Code, the obligation is non dischargeable.").
[55] *In re Villarie*, 648 F.2d 810 (2d Cir. 1981).

20

paycheck. On the facts before it, the Second Circuit (reversing the bankruptcy court) concluded that a loan from a retirement plan could not be discharged, while also permitting the resumption of the payroll deduction. Nowhere in the decision, however, does the Second Circuit state that the loan was not a debt.

This line of cases has been called into question by Professor Laura Bartel in her persuasive article, *Pension Plan Loans and Means Testing – The Pernicious Endurance of Villarie*.[56] Professor Bartel argues that *Villarie* was wrongly decided at the time, was expanded without basis by its progeny, but regardless, ignored the Supreme Court's decision in *Johnson*[57] and was effectively overruled by BAPCPA.[58]

In *Johnson* the issue before the Supreme Court was whether a mortgage lien could be included in a chapter 13 plan after the underlying personal obligation had been discharged in a previous chapter 7 proceeding. Conducting a statutory analysis, the Court concluded that the holder of a mortgage interest that survives a discharge of a debtor's personal liability has a "right to payment" or a "right to an equitable remedy" upon default and therefore has a "claim" as that term is defined in the Code. In arriving at its conclusion, the Court specifically recognizes that nonrecourse obligations and *in rem* remedies can form the basis for a claim, pointing to § 102(2) (establishing rules of construction) which provides that the

---

[56] Laura B. Bartell, *Pension Plan Loans and Means Testing - The Pernicious Endurance of Villarie*, 87 AM. BANKR. L.J. 89 (2013).

[57] *Johnson v. Home Loan*, 501 U.S. 78, 111 S.Ct. 2150 (1991).

[58] For an extensive examination of the relevant provisions of the Code to the question of whether a loan from the New York City Retirement Code is debt in the context of chapter 13 *see In re Buchferer*, 216 B.R. 332 (Bankr. E.D.N.Y. 1997) (also discussed by Bartel); *see also In re MacDonald*, 222 B.R. 69, 76 (Bankr. E.D. Pa. 1998) ("We find considerable merit in the reasoning of *Buchferer*."); *In re Dubbin*, Adv. Pro. No. 21-1004-t, 2021 WL 3476959 (Bankr. D. N.M. Aug. 6, 2021) (denying a motion to dismiss and finding that a chapter 7 trustee stated a claim for both a fraudulent conveyance and a preference in seeking to avoid prepetition payments to a 401(k) profit sharing plan).

phrase "claim against the debtor" includes "claims against property of the debtor."[59]
Similarly, the Court points to § 502(b)(1)[60] for the proposition that if an objection is filed a
court "must allow a claim if it is enforceable against *either* the debtor *or* his property."[61]

Applying the holding of *Johnson* and the relevant defined terms leads to the
conclusion that a retirement loan is a debt as that term is used in the Means Test. Under the
Means Test, a debtor is permitted to deduct from current monthly income "the debtor's
average monthly payments on account of secured debts," which is calculated as the sum of
"the total of all amounts scheduled as contractually due to secured creditors . . . ."[62] A
"creditor" is an entity that has a claim against a debtor,[63] and also includes a claim against
property of the debtor.[64] A "claim" is a "right to payment" or a "right to an equitable
remedy"[65] which the Supreme Court has held includes rights of holders of nonrecourse debt
to their collateral. Finally, the Code recognizes that a claim is secured claim to the extent of
the amount subject to setoff.[66]

---

[59] 11 U.S.C. § 102(2) provides in relevant part: "In this title—(2) 'claim against the debtor' includes
claim against property of the debtor."

[60] 11 U.S.C. § 502(b)(1) provides:
    Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a
    claim is made, the court, after notice and a hearing, shall determine the amount of such claim in
    lawful currency of the United States as of the date of the filing of the petition, and shall allow such
    claim in such amount, except to the extent that —
        (1) such claim is unenforceable against the debtor and property of the debtor under any
            agreement or applicable law for a reason other than because such claim is contingent or
            unmatured;. . . .

[61] *Johnson*, 111 S.Ct. at 2155 ("Thus, §502(b)(1) contemplates circumstances in which a 'claim,' like
the mortgage lien that passes through a Chapter 7 proceeding, may consists of nothing more than an
obligation against the debtor's property.")

[62] 11 U.S.C. § 707(b)(2)(A)(iii).

[63] *Id.* § 101(10)

[64] *Id.* § 102(2).

[65] *Id.* § 101(5).

[66] *Id.* § 506(a)(1).

As applied to retirement loans, generically speaking, (i) the "creditor" is the retirement plan (acting through a plan administrator), (ii) the "claim" is the right against property of the debtor, i.e. the debtor's 401(k) account, (iii) and that claim is "secured" by the Plan's right to setoff the loan against a debtor's retirement account. The repayment of a loan against a 401(k) retirement account, therefore, is a "secured debt" for purposes of the Means Test.

The UST's only argument was the compelling simplistic one accepted by the majority of courts that Mr. Livingston simply borrowed money from himself. While that argument has intuitive appeal,[67] it ignores the entire structure of ERISA qualified plans, which are subject to heavy regulation under the Internal Revenue Code.[68] An ERISA plan is a separate entity run by one or more fiduciaries who administer and manage the plan.[69] The plan is the lender, not the participant.[70] The plan must charge a reasonable rate of

---

[67] The argument seems to be that repaying a loan to oneself is preferring oneself over "real creditors," something that should not be countenanced. In BAPCPA, however, Congress expressly created preferential treatment for contributions to ERISA plans and repayment of ERISA loans when it legislated that a chapter 13 plan may not materially alter the terms of a loan made under ERISA nor shall such loan repayments constitute "disposable income" under § 1325. *See Bartel*, section IV (The BAPCPA Amendments) at * 109-112.

[68] Bartel * 91-95; *See, generally*, FAQs about Retirement Plans and ERISA, U.S. Department of Labor, Employee Benefits Security Administration ("FAQs") found at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/faqs/retirement-plans-and-erisa-for-workers.pdf. *See also Dubbin* 2021 WL 3476959 *2 listing statutory requirements for ERISA plans.

[69] Bartel, * 91; *FAQs* 10.
**Does your plan have to identify those responsible for operating the plan?**
In every retirement plan, there are individuals or groups of people who use their own judgment or discretion in administering and managing the plan or who have the power to or actually control the plan's assets. These individuals or groups are called plan fiduciaries. Fiduciary status is based on the functions that the person performs for the plan, not just the person's title. A plan must name at least one fiduciary in the written plan document, or through a process described in the plan, as having control over the plan's operations. This fiduciary can be identified by office or by name. For some plans, it may be an administrative committee or the company's board of directors. Usually, a plan's fiduciaries will include the trustee, investment managers, and the plan administrator. The plan administrator is usually the best starting point for questions you might have about the plan.

[70] Bartel * 92.

interest and the loan must be adequately secured.[71]  A partcipant's failure to repay a loan in accordance with ERISA requirements may redound not only to the detriment of the borrower, but also to the detriment of the plan.[72]

The UST did not distinguish between a private 401(k) ERISA plan and the federal TSP at issue here.  The Federal Retirement Thrift Investment Board, which administers the TSP, describes it as "a tax-deferred defined contribution plan similar to private sector 401(k) plans which provide Federal employees the opportunity to save for additional retirement security."[73]  The TSP has a four person Board as well as an Executive Director and a fourteen member advisory council.[74]  It has pooled investments reflected in a choice of Lifecycle and individual funds.[75]  And, it, too, is subject to extensive regulation including requirements for obtaining loans.[76]

I will not easily ignore such a heavily regulated federal scheme which dictates the separateness of the plan from the beneficiary.  As the *Dubbin* Court states:

> Even if the debtor could trace the borrowed funds back to her pension plan account, taking out a pension plan loan is a far cry from "borrowing your own money."  Borrowing your own money means taking cash from your Christmas fund envelope to pay for an unanticipated car repair, while promising yourself that you will pay back the Christmas fund with your next paycheck.  With a

---

[71] Bartel * 94-95; *FAQs* 8.
**Can you borrow from your 401(k) plan account?**
401(k) plans are permitted to – but not required to – offer loans to participants.  The loans must charge a reasonable rate of interest and be adequately secured.  The plan must include a procedure for applying for the loans and the plan's policy for granting them.  Loan amounts are limited to the lesser of 50 percent of your account balance or $50,000 and must be repaid within 5 years (unless the loan is used to purchase a principal residence).

[72] Bartel * 95 (failure to comply with all loan requirements can threaten the plan's qualified status).

[73] Ex. 7 (2020 Annual Statement) directs participants to obtain information from the Federal Retirement Thrift Investment Board at www. frtib.gov.

[74] *See* frtib.gov/BoardMembers/index.html.

[75] *See* tsp.gov/fund-performance/.

[76] Title 5 Code of Federal Regulations Part 1655 (Loan Program).  Recently, Congress permitted the Federal Retirement Thrift Investment Board to create special loan rules for TSP participants affected by COVID-19.  *See* Bulletin found at tsp.gov/bulletins/20-3/.

pension plan loan, in contrast, the participant must first give money to the pension plan fiduciary, who invests it subject to complex laws and regulations. The resulting investment is held by the plan trustee in a pooled trust fund. The participant has an account, with a balance equal to her contributions, any employer contributions, and investment gains or losses. In the event of an unanticipated car repair (to use the same example), the participant must apply for a pension plan loan, qualify, sign a promissory note, agree to repayment and wage withholding terms, and pay interest. Only then will the participant/borrower be able to get the loan from the fiduciary and pay the repair bill.

The two situations are not similar. Courts should not be so quick to collapse the carefully constructed federal and state law framework for pension plans, including pension plan loans, into the facile, incorrect description of "borrowing her own money."[77]

The UST did not ask me to recharacterize the TSP Loan or submit evidence supporting recharacterization. Nor did I hear argument on whether recharacterization would be appropriate given the bright line nature of the Means Test.

For these reasons, I conclude that the TSP Loan is a secured debt that is properly deducted from current monthly income as part of the Means Test.[78]

---

[77] *Dubbin*, 2021 WL 3476959 at * 7.

[78] Because many considerations with respect to repayments of loans from retirement plans were not briefed or argued, I will certainly entertain a contrary view on any future motion to dismiss. In that connection, I also note that the State of Delaware permits a participant in a retirement plan to exempt assets held in or amounts payable under a retirement plan. 10 Del.C. § 4915(a). The State also recognizes loans from retirement plans as "loans." 10 Del.C. § 4915(e) ("A participant or beneficiary of a retirement plan is not prohibited from granting a valid and enforceable security interest in the participant's or beneficiary's interest under the retirement plan to secure a loan to the participant or beneficiary from the plan, and the right to assets held in or to receive payments from the plan is subject to execution and attachment for the satisfaction of the security interest or lien granted by the participant or beneficiary to secure the loan.").

**Conclusion on the Means Test**

Using the updated number for Income of $9,142.14 and having determined the proper expense deduction is $9,603.49 as follows:

| | |
|---|---|
| Food, clothing and other expense | $1,292.00 |
| Health care (out of pocket) | $136.00 |
| Insurance and operating (Housing) | $611.00 |
| Vehicle Operation Expense | $448.00 |
| Vehicle Net Ownership Expense | $207.96 |
| Taxes | $1,899.80 |
| Involuntary Payroll Deductions | $546.95 |
| Life Insurance | $49.94 |
| Optional Telephone Service | $400.00 |
| Health Insurance | $578.83 |
| Debt Payment/Home Mortgage | $1,483.12 |
| Debt Payment/Jeep Wrangler | $896.12 |
| Debt Payment/Chevy Cruze | $325.04 |
| Debt Payment/TSP Loan | $680.12 |

Debtors' monthly disposable income is *negative* $412.74, or a 60-month disposable income of *negative* $24,764.40.  As such, a presumption of abuse does not exist.

> **II.    Assuming Arguendo a Presumption of Abuse Exists, the Presumption has been Rebutted**

If I am incorrect in my conclusion that the TSP Loan can be deducted as repayment of a secured debt, a presumption of abuse exists as Debtors would have $218.77 in monthly income, or a 60-month disposable income of $13,126.20, which is greater than 25% of their

unsecured debt, or $11,340.26. Notwithstanding, Debtors may rebut the presumption by showing that an additional expense is appropriate based on special circumstances.

Initially, for a debtor to successfully demonstrate a special circumstance, he must fulfill both the procedural and substantive requirements of § 707(b)(2)(B).[79] To satisfy the procedural requirements, a debtor must "itemize each additional expense or adjustment of income and . . . provide . . . (I) documentation for such expense or adjustment to income; and (II) a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable."[80] Additionally, a debtor must "attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required."[81]

Next, the debtor must show that the additional expense or adjustment to income is required by special circumstances. The statute contains two examples of special circumstances—a serious medical condition and a call or order to active duty in the Armed Forces. These examples are not exclusive. Further, special circumstances need not be involuntary. The language of the statute was meant to be expansive, not limiting.[82] At bottom, whether special circumstances exist must be decided on a case-by-case basis.

In *Haman*, Judge Shannon found that special circumstances existed when the debtor's son incurred student loan debt three years prior to the bankruptcy case, debtor was a co-signor on the obligation, her son was unable to make the required payments and the debt was not dischargeable. In so finding, Judge Shannon concluded that the debtor had no

---

[79] *In re Haman*, 366 B.R. 307, 312 (Bankr. D. Del. 2007).

[80] 11 U.S.C § 707 (b)(2)(B)(ii).

[81] 11 U.S.C § 707 (b)(2)(B)(iii).

[82] *In re Haman*, 307 B.R. at 313-314 (analyzing the language of the statute, legislative history and case law). *See also In re Templeton,* 365 B.R. 213, 216 (Bankr. W.D. Okla. 2007)*; In re Armstrong,* No. 06-31414, 2007 Bankr. LEXIS 1812, at *6 (Bankr. N.D. Ohio May 24, 2007).

reasonable alternative but to incur the monthly expense because the only way to stop

making the payment was to pay off the obligation in full or for debtor's son to resume the

monthly payments which was not a reasonable expectation because of his circumstances.[83]

In drawing his conclusions, Judge Shannon looked to *In re Thompson*[84] and *In re*

*Lenton,*[85] both of which found a debtor had demonstrated, on the facts of each case, that

special circumstances permitted the payments on a 401(k) loan to be deducted as an expense

in the Means Test analysis.  In *Thompson*, the bankruptcy court noted that the loan was not

made in contemplation of bankruptcy, but in an attempt to address a worsening financial

condition.  In *Lenton*, the court found that the loans were incurred a year before bankruptcy

and used to pay credit card indebtedness reducing unsecured debt.  In both cases, the court

concluded that the only way to terminate the debt was for debtor to quit his job or make a

payment in full.  Deeming the first option "financially irresponsible" and the second option

impossible, the *Thompson* Court found "no reasonable alternative" as required by the

statute.  The *Lenton* court concurred, and Judge Shannon found these same options in

*Haman* to support a finding of special circumstances there.

Here, the TSP Loan was issued on February 20, 2019, two years and three months

prior to the filing of the bankruptcy proceeding.  Had Debtors not tapped Mr. Livingston's

retirement fund to purchase the car, it is likely that they would have incurred secured debt

for the car, which would be fully deductible, without question, as a secured loan under the

---

[83] *Haman,* 302 B.R. at 315, 318.
[84] *In re Thompson,* 350 B.R. 770 (Bankr. N.D. Ohio 2006) *rev'd Eisen v. Thompson,* 370 B.R. 762 (N. D. Ohio 773).  While the district court reversed the bankruptcy court on its determination regarding special circumstances (as well as its conclusion that the repayment of a loan from a retirement plan is debt that can be deducted in the Means Test analysis), I find the bankruptcy court analysis more persuasive across the board.
[85] *In re Lenton,* 358 B.R. 651 (Bankr. E.D. Pa. 2006).

Means Test. Moreover, as in *Thompson*, *Lenton* and *Haman*, there is no reasonable alternative to repayment of the TSP Loan. Quitting Mr. Livingston's job would be financially irresponsible and there is no evidence in the record to suggest that the TSP Loan can be repaid in full. Moreover, Mr. Livingston's need to immediately address the security clearance concern raised by his supervisor left the Livingstons no real options.

Under these circumstances, I find that Debtors have met their burden to show that special circumstances exist such that the TSP Loan is deductible on this basis as well.[86]

### III.    The Totality of the Circumstances of Debtors' Financial Situation do not Demonstrate Abuse

The Trustee alternatively moves to dismiss Debtors' case based on the totality of the circumstances. A case may be dismissed if the totality of the debtor's financial situation demonstrates abuse.[87] While many courts consider multi-factor tests,[88] the UST focuses on two grounds.

---

[86] In *Haman*, Judge Shannon also considered and rejected an argument by the UST that the debtor had a reasonable alternative – converting the case to a chapter 13, modifying the rights of the student loan lender and making a pro rata distribution for the length of the chapter 13 plan. Judge Shannon rejected the consideration of potential results under a hypothetical chapter 13 case in the special circumstances analysis and found such an argument more properly in the domain of the totality of the circumstances test. *Id.* In so holding, he observed that only one court had considered this issue. Because of my conclusion, I need not decide that issue here.

[87] 11 U.S.C § 707(b)(3) states:
In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in paragraph (2)(A)(i) does not arise or is rebutted, the court shall consider—
    (A) whether the debtor filed the petition in bad faith; or
    (B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

[88] *See e.g. DeAngelis v. Shores (In re Shores)*, No. 1:09-bk-08905MDF, 2010 Bankr. LEXIS 4912, at *10-11 (Bankr. M.D. Pa. Dec. 8, 2010) (considering: (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment; (2) whether the debtor made consumer purchases far in excess of his ability to repay; (3) whether the debtor's proposed family budget is excessive or unreasonable; (4) whether the debtor's schedules and statements of current income and expenditures reasonably and accurately reflect his true financial condition; (5) whether the bankruptcy petition was filed in bad faith; (6) whether the debtor engaged in eve of bankruptcy

The UST's primary argument is that "Debtors can pay a good portion, if not all, of their unsecured debts over a reasonable period of time pursuant to a Chapter 13 plan."[89] The factual predicate for the argument is Debtors' Schedule I and J. As the UST correctly notes, Schedules I and J reflect that the Livingstons' joint monthly net wages total $5,205.36 and their expenses total $5,469.37 for a monthly net income of *negative* 264.01.[90] The UST takes issue with two of Debtors' expenses: (i) the $325.04 for the Chevy Cruze, which the UST again argues is for the benefit of Debtors' granddaughter and (ii) the $400 expense for what the UST argues is an unreasonable amount for cell phone service. Doing the math, the UST contends that if these two expenses are removed, Debtors would have a suplus of $461.03 per month, or $27,661.80 over 60 months which could be paid to creditors. The UST also suggests that the purchase of the Jeep Wrangler "in the months" before the bankruptcy filing is a separate basis for a finding of abuse. Debtors specifically deny these allegations and the impropriety of any of their expenses or purchases.

As for the expenses, for the reasons set forth above, I have already determined that the $400 expense for telephone and internet is a proper expense. As for the monthly payment for the Chevy Cruze, once again, the evidence showed that it is not for the use of Debtors' granddaughter. Further, the UST did not argue that this car payment, in and of

---

purchases; (7) whether the debtor enjoys a stable source of future income; (8) whether he is eligible for adjustment of his debts through chapter 13 of the Code; (9) whether there are state remedies with the potential to ease his financial predicament; (10) the degree of relief obtainable through private negotiations; and (11) whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter, and other necessities.).

[89] Motion to Dismiss ¶ 23. *See also id.* ¶ 29 ("The plain language of 11 U.S.C. § 707(b)(3)(B) requires a court to consider the 'totality of the circumstances . . . of the debtor's financial situation.' This analysis includes a debtor's ability to repay his or her debts. As noted above, the Debtors here have the ability to repay their unsecured creditors pursuant to Section 707(b)(3)(B), therefore any granting of relief in this case should be found to be an abuse of the provisions of Chapter 7 based on the totality of the circumstances of the Debtors' financial situation.")(citations omitted).

[90] UST Exh. 1 (Schedules I, J).

itself, is unreasonable. On the numbers, therefore, Debtors' have a negative monthly

cashflow with no funds available for a distribution to creditors.[91]

That leaves the purchase of the Jeep Wranger nine months prior to the bankruptcy

filing. Under the circumstances here, I do not find this to constitute an abuse. Mrs.

Livingston testified that she needs a four-wheel vehicle to get to work in the winter and that

she obtained the best monthly payment she could given their credit. She also testified that

she uses the Chevy Cruze (a non-four wheel vehicle) to take her mother to doctor

appointments. There is no suggestion that Debtors were contemplating bankruptcy when

this purchase was made or at any time prior to Mr. Livingston's security review. Nor is

there evidence that Debtors contemplated the security clearance concern before it was

raised. And, while one could reasonably question the wisdom of this purchase, the UST

adduced no evidence that Debtors were generally making purchases in excess of their ability

to repay. I do not find that maintaining multiple vehicles, without more, constitutes abuse

sufficient to dismiss the case.[92]

As for the other factors courts consider, the UST did not move separately to dismiss

for bad faith and did not argue bad faith as a factor in the totality of the circumstances as to

Debtors' financial condition. Further, Mr. Livingston faces mandatory retirement in April

of 2023 and Mrs. Livingston's hours have been cut, so there is no guarantee that Debtors

will enjoy a stable source of income through the pendency of a chapter 13 case. And, except

---

[91] If I were not to permit the monthly payment for the Chevy Cruz, the monthly surplus would be
$61.03, or a 60 month availability of $3,661.80. This payout to creditors would be 8%, much less
than 25% benchmark for abuse. Further, according to the Schedules, the value of the Chevy Cruz is
less than the outstanding secured debt so there is no equity in the vehicle. The UST did not
challenge the valuation.

[92] The UST did not cite any cases for the proposition that the maintenance of multiple vehicles is per
se an abuse.

as set forth above, the UST did not suggest, much less present evidence, that Debtors' expenses could be reduced significantly without depriving them of shelter, food and basic necessities.

In examining the totality of the circumstances of Debtors' financial situation, I find no support for a finding of abuse.

## IV.    For similar reasons, in the Use of My Discretion, I would Not Dismiss the Case under Section 707(b)

Finally, and alternatively, I would exercise my discretion not to dismiss this case. Notwithstanding a presumption of abuse or even the totality of the circumstances of a debtor's financial situation, the Code provides a court discretion in determining whether a case should be dismissed.[93]  While this discretion should be used judiciously, based on the confluence of facts here (discussed previously and below), dismissal is not warranted.

Initially, there is no evidence in the record that Debtors would have filed this bankruptcy case if Mr. Livingston's security clearance was not an issue.  The unrebutted evidence is that a routine security review by his supervisor was the precipitating factor for this bankruptcy filing.  Relatedly, a chapter 7 case will provide for an immediate discharge of his debt addressing the security clearance concern.  In a chapter 13 case, Debtors will not receive a discharge until the completion of payments under a three or five year plan. Jeopardizing Mr. Livingston's livelihood does not benefit Debtors or their creditors.

Further, a conversion to a chapter 13 case would provide no benefit to creditors.  In a chapter 13, amounts required to repay the TSP Loan are not "disposable income" for

---

[93] *Compare* § 707(b)(1)("the court . . . *may dismiss* a case . . . if it finds that the granting of relief would be an abuse of the provisions of this title") with § 707(b)(2)(A)(i)("in considering . . . whether the graning of relief would be an abuse . . . the court *shall presume* abuse exists if . . ."); *In re Mravik*, 399 B.R. 202, *supra*.

purposes of confirmation of a chapter 13 plan.[94]  Moreover, if Debtor defaults on the TSP

Loan, he will be deemed to have received a distribution in an amount equal to the entire

outstanding balance of the loan at the time of the default.  That immediate tax consequence

would likely be an administrative claim against the estate payable prior to payments to

unsecured creditors.  Again, any chapter 13 plan proposed by Debtors would provide no

recovery for unsecured creditors.

Finally, the testimony was unrefuted that Debtors' income is likely to be

substantially less in the not too distant future.  Mrs. Livingston's hours were recently cut in

half.  And, Mr. Livingston will be forced to retire in April of 2023.  At that time, his income

will be cut in half.

Dismissal under these circumstances does not function to correct any perceived

abuse—and there is none.  Particularly given the need for Mr. Livingston to maintain his

security clearance, dismissal of this case is unwarranted.

**Conclusion**

For the foregoing reasons, the Motion to Dismiss is denied.  An order will follow.


Dated:  March 29, 2022

Laurie Selber Silverstein
United States Bankruptcy Judge

---

[94]  11 U.S.C. § 1322(f) ("A plan may not materially alter the terms of a loan described in section 362(b)(19) and any amounts required to repay such loan shall not constitute 'disposable income' under section 1325.").